[No. 15461.   *En Banc.*   January 7, 1920.]

# NATIONAL BANK OF COMMERCE OF SEATTLE, *Respondent,* v. SEATTLE NATIONAL BANK, *Appellant.*[1]

BANKS AND BANKING (25)—PAYMENT OF FORGED CHECKS—RIGHTS AS BETWEEN BANKS—ACCEPTANCE—EFFECT. Where checks to fictitious payees with forged indorsements passed through the clearing house and were paid by the drawee bank, the payment admits the existence of the payees and their capacity to indorse, under Rem. Code, § 3453, providing that acceptance of a check admits the existence of the drawer and drawee and their capacity to draw and indorse; since payment includes acceptance.

SAME (25).   In such case, the drawee bank paying the checks cannot recover the sums from the bank passing them through the clearing house, on the ground of the nonexistence of the payees and negligence in paying forged checks, upon showing that the person depositing and indorsing the checks and forging the names of the payees was acting under an assumed name as a customer of the passing bank, where such party was at all times insolvent and deposited to a checking account in usual course and there was nothing to put the passing bank upon inquiry; since the vice of the transaction rested in the fact of the fictitious payees, whose existence, under the statute, was admitted by the drawee when it paid them.

SAME (25).   A national depositary bank chargeable with notice of the regulations of the Treasury Department requiring checks of a public disbursing officer to state the object or purpose for which any check was drawn cannot claim negligence on the part of other banks not aware of the regulations in causing a loss by passing checks drawn upon the depositary bank to fictitious payees by a public disbursing officer, where for years such depositary bank cashed and passed a stream of such checks by such officer which contained no notation as to their object or purpose, and gave no caution or notice that they were irregular on their face.

BILLS AND NOTES (90)—PAYMENT OF CHECK—RIGHTS OF PARTIES— "HOLDER." Rem. & Bal. Code, § 3457, of the negotiable instrument law providing that all indorsers warrant to subsequent holders in due course the matters mentioned in the preceding section and engage, in case of dishonor and due notice, to pay the amount thereof to the holder, was not intended to define any obligation or liability to the drawee, who by acceptance, under the terms of Id.,

[1]Reported in 187 Pac. 342.

§ 3453, admits the existence of the payee and his capacity to indorse; since the drawee paying a check is not a "holder" and acceptance and payment strips the instrument of all negotiability.

JUDGMENT (209) — CONCLUSIVENESS—PERSONS CONCLUDED—NOTICE TO DEFEND—NONLIABLE. Judgment for the United States against a drawee bank for the amount of government funds embezzled by a public disbursing officer, by means of checks to fictitious payees and forged indorsements, wrongfully paid by the bank, does not foreclose the defense of another bank which passed the checks through the clearing house, on their deposit to a checking account, although the defense of the action was tendered to it, where the defense was declined by the passing bank and it was under no legal obligation in the premises to make good the loss of the drawee bank.

Appeal from a judgment of the superior court for King county, Honorable Marion Edwards, Judge *pro tempore,* entered May 3, 1919, upon findings in favor of the plaintiff, in an action to recover money paid on forged checks, tried to the court. Reversed.

*Bausman & Oldham* and *W. L. Nossaman,* for appellant.

*Kerr & McCord* and *Stephen V. Carey,* for respondent.

MITCHELL, J.—Both of the parties to this action are national banks engaged in business in the city of Seattle. During the years 1907, 1908 and 1909, one M. P. McCoy was an examiner of surveys and special disbursing agent for the United States Government, acting under the directions of the Interior Department. While McCoy was thus employed, the United States caused to be deposited, from time to time, with the National Bank of Commerce considerable sums of money to his credit, to be used solely for paying expenses he was authorized to incur in his services to the general government as such examiner of surveys and special disbursing agent. The deposits were made with the plaintiff as a government depositary, in ac-

cordance with the laws of Congress and the regulations of the Treasury Department relating to such deposits and the disbursements thereof. From time to time during the years mentioned, McCoy drew fraudulent checks on the depositary bank aggregating an amount largely in excess of those to which this action relates, payable to fictitious payees, forged the indorsements of such payees upon the checks, and procured from various banks for his own use the amounts of such checks, including the sum of $13,509.37 from the defendant. After the issuance of such checks from time to time, they were presented to and paid by the plaintiff without any authority from the United States and charged against the public funds on deposit to the credit of McCoy. The frauds and forgeries being discovered by the United States, suit was brought by it to recover the total amount of such deposits thus paid out by the National Bank of Commerce. That suit was successful. *United States v. National Bank of Commerce*, 205 Fed. 433; and *National Bank of Commerce v. United States*, 224 Fed. 679. The National Bank of Commerce having satisfied that judgment, instituted the present action to recover from the defendant the amount of those fraudulent checks, one hundred and thirty-five in number, that passed through the defendant bank, together with interest. The cause was tried by the court without a jury, and resulted in a judgment in favor of the plaintiff, as demanded in the complaint. Defendant has appealed.

All of the one hundred and thirty-five checks involved were fraudulently drawn on respondent. They passed through appellant's bank from June 30, 1908, to September 4, 1909, a portion every month except October, 1908, and February and March, 1909. Each of the checks was actually signed by M. P. McCoy, as maker, to which signature he attached the description

"Exr. Surveys & S. D. A.," and approximately one-half of them (about evenly distributed through the whole period of time) did not bear any notation of the object or purpose for which they were drawn. Upon forging the payees' names as indorsers, McCoy then indorsed the name "F. M. Clark" and deposited the checks to his credit, as F. M. Clark, with appellant, that knew him by that name only. The checks, as received by appellant, were promptly passed on through the clearing house association and promptly paid by respondent and, as already stated, charged by it against the United States deposit. Respondent claims it knew nothing of the infirmity in the checks until it received notice to that effect from the United States district attorney on March 10, 1910. Nor did appellant have notice thereof until it in turn promptly received from respondent a copy of the notice from the United States district attorney.

By § 185 of the negotiable instruments law (Rem. Code, § 3575), a check is declared to be a bill of exchange drawn on a bank, payable on demand. Section 62 of the same law (Rem. Code, § 3453), provides:

"The acceptor by accepting the instrument engages that he will pay it according to the tenor of his acceptance; and admits—

"(1)   The existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument; and

"(2)   The existence of the payee and his then capacity to indorse."

If respondent is allowed to prevail in this action it must do so in spite of the very things the statute says it admits, viz.: (a) The existence of the drawer, the genuineness of his signature [neither in dispute here], and his capacity and authority to draw the instrument, and (b) the existence of the payee and his then ca-

pacity to indorse. Certainly, if such admissions im-
posed by the statute apply in the case of mere accept-
ance, necessarily they must apply in the case of honor-
ing by actual payment, inasmuch as payment includes
acceptance. *First National Bank v. Bank of Cottage
Grove,* 59 Ore. 388, 117 Pac. 293; *National Bank of
Rolla v. First Nat. Bank of Salem,* 141 Mo. App. 719,
125 S. W. 513; *Bank of Indian Territory v. First Nat.
Bank,* 109 Mo. App. 665, 83 S. W. 537; *Neal v. Coburn,*
92 Me. 139, 42 Atl. 348, 69 Am. St. 495.

On the other hand, it is insisted, notwithstanding
the plain provisions of the law, that the case of *Ca-
nadian Bank of Commerce v. Bingham,* twice before
this court, and reported in 30 Wash. 484, 71 Pac. 43, 60
L. R. A. 955, and 46 Wash. 657, 91 Pac. 185, is au-
thority to the contrary. Consideration is here given
to that case only to ascertain if its doctrine is applic-
able to the present case. That was a case in which
seven checks were forged, that is, the name of the
drawer was forged to all of them. They were passed
through Bingham's private bank on to the drawee
and paid by it. Shortly, upon discovery of the forg-
eries, the drawee bank sued Bingham upon his indorse-
ment. A demurrer was sustained to the complaint,
and the ruling reversed in the first report of the case.
Afterwards, upon trial, plaintiff prevailed, and on
appeal the judgment was affirmed. The complaint
alleged innocence and good faith on the part of plain-
tiff, and further alleged not only general, but specific
acts of negligence on the part of Bingham, to the effect
that he failed and neglected to have the holder and the
person in whose possession the check was at the time
of presentation to him for payment properly identified,
or identified at all, and that, had he used any care or
caution, he would have easily discovered the forgeries.

In discussing the complaint, the court specifically stated that Bingham relied upon the general doctrine that the drawee bank is bound to know the signature of its own depositor and must, at its own risk, detect a forgery before paying the check. It was also stated that the drawee bank conceded the general rule but contended for an exception, sustained by the court in the opinion, viz.:

"That if it appears that the one to whom payment was made was not an innocent sufferer, but was guilty of negligence in not doing something which plain duty demanded, and which, if it had been done, no loss would have been entailed upon anyone, he is not entitled to retain the moneys paid through a mistake on the part of the drawee bank."

The court disposed of the matter just as counsel presented it, upon the faith of the general doctrine without any reference to the statute law. That decision settled the law of the case; it was so stated in the second decision. At the trial of that case it appeared that the checks were forgeries; that, as to one of them, the Bingham bank took it from some one whom none of its officers could recall and cashed it upon its being indorsed in the name of the payee, a person known to none of the officers of the bank, nor to any of the officers of the company whose name had been forged as maker of the check; while, as to the other six checks, they were presented to the Bingham bank by various business men who had taken them in the course of trade. The court found both banks had acted negligently, but gave judgment against Bingham upon his indorsement, upon the theory, it seems, that, in addition to his negligence, it did not appear from the pleadings and evidence in the case that he had suffered any loss by reason of the delay or negligence of the drawee bank.

The present case is different from that case in many material respects. Here M. P. McCoy, who committed all the fraud, has at all such times been, and is, insolvent. Besides, as was said in the case of *United States v. National Bank of Commerce of Seattle,* 205 Fed. 433, referring to these same fraudulent checks of McCoy's:

"The defendant bank, as a national depositary, was chargeable with notice of the limitations of McCoy's authority to check out the public money deposited with it. Section 5153 of the Revised Statutes (U. S. Comp. St. 1901, p. 3465), provides:

" 'All national banking associations, designated for that purpose by the Secretary of the Treasury, shall be depositaries of public money . . . under such regulations as may be prescribed by the Secretary.'

"One of the regulations promulgated by the Secretary of the Treasury on April 16, 1903 (Department Circular No. 49, § 6), provides:

"If the object or purpose for which any check of a public disbursing officer is drawn is not stated thereon, as required by departmental regulations, or if any reason exists for suspecting fraud, the office or bank on which such check is drawn will refuse its payment.' "

As already noticed, respondent, wholly neglectful of the law and the regulations of the Treasury Department, permitted a stream of checks, nearly half of which contained no notation as to their object or purpose, to pass through appellant bank for a period of nearly two years, without any caution or suggestion that any of them were not regular on their faces as to the positive requirements of the law and department regulations. Appellant knew nothing about the regulations, nor did it have any information as to the meaning of the designation, "Exr. Surveys and S. D. A.," written under McCoy's signature on the checks. It further appears, during the whole period of the account with appellant, comprising the one hundred and

thirty-five checks, McCoy (who dealt with it in the name of F. M. Clark) never received any cash, but treated it as a checking account in such a way that he always had a substantial balance to his credit, so that, at most any time within the period, if respondent had, within a week or ten days after receiving any such check, called appellant's attention to irregularities on the face of the checks, measured by the treasury department regulations, appellant could have seasonably protected itself against loss, besides being put upon inquiry generally in its dealings with McCoy.

McCoy forged the payees' names in handwritings as varied as the number of such payees, duplicating the handwritings for each name, when used oftener than once, with such cleverness as to escape detection at the hands of the officers of both banks, and then indorsed them as F. M. Clark, in which name he transacted all his business with appellant. It is contended appellant was conclusively at fault for its mistake as to the identity of Clark. The real vice in the checks was the fictitious payees, as to whom, by the terms of the statute, respondent admitted their existence and their capacity to indorse, by its act of accepting and paying the checks. There was nothing suspicious about the way in which appellant became acquainted and transacted business with M. P. McCoy as F. M. Clark. He went to Seattle a stranger in November, 1907. On November 18, he entered the bank to open an account, gave the name of F. M. Clark and signed an identification card as such. At the time, he had a "C. H." certificate for $100 and a check for $500, neither of which is involved in these fraudulent transactions, deposited them with the bank, informing it he did not want the money, but only wanted the paper collected so he could check on it later. The collections were made, and thereafter other deposits were made

by him down to January 18, 1918, the total amounting to $1,932.25, against which he drew checks from November 25, 1907, to February 27, 1908, when the account was closed. The account remained closed until June 30, 1908, when he commenced a new account, involving these one hundred and thirty-five fraudulent checks, in the same name as that by which he was already known to the bank for three months, during which time he did business with it, in a false name, it is true; but that was immaterial. The name he used was sufficient to serve its purpose of identifying the person with whom the appellant was dealing. And it is to be noticed that, when he opened his last account, he desired no cash and always maintained a substantial balance until his final check on September 7, 1909. It presents a different situation from that in the case of *Canadian Bank of Commerce v. Bingham, supra,* where a fraudulent indorser, unknown as to his person and name, demanded and immediately received payment on passing the forged checks, while in the present case, Clark, known to appellant as such by a former course of apparently legitimate dealing, received no payment from appellant except by his checks, drawn days after the several deposits were made and days after the fraudulent checks had passed on to and been accepted and paid by respondent. There is no evidence, nor are we cognizant of any reason, which required appellant, at the time of opening the second account, or at any other time, to conduct an examination to ascertain if Clark was Clark, or if he was McCoy, else be charged with negligence. He customarily appeared in person at the bank in making deposits, and there seems to have been nothing suspicious about his conduct with the bank and its officers.

Counsel for appellant urge upon our consideration the alleged violation of the clearing-house rule requir-

ing "not good" checks to be returned within twenty-four hours, Saturdays excepted. But we do not discuss the rule, because, independent of it, if applicable here, respondent is bound just as much without it, in this case, because it kept the checks without notice of any kind to appellant until long after all the transactions had taken place.

Both banks were members of the Seattle clearing house, the object of which, as respondent states, is to facilitate and effect at one place daily exchanges between the member banks. Reliance is had by respondent upon a portion of article 14 of the articles of the Association of Seattle Clearing House, and a portion of one of its rules. The portion of article 14 relied on relates to all items passing through the clearing house and requires them to have the written or stamped indorsements, in a certain designated form, of the bank passing them, and then specifically provides:

"The bank using such stamp thereby makes itself responsible for all items so stamped by it, the same as if its indorsement had been written thereon."

Likewise, the portion of the rule of the clearing house referred to deals with the use of the stamp upon negotiable paper for clearance by members of the association, states the purpose and effect of the use of the stamp, and says:

"It is the intention of this resolution to give to indorsements by the C. H. stamp the effect of a written indorsement."

That is, it is but the equivalent of the obligation imposed by the statute upon the passing bank. Section 66 of the negotiable instruments law (Rem. Code, § 3457) provides:

"Every indorser who indorses without qualification, warrants to all subsequent holders in due course—

11—109 WASH.

"(1)   The matters and things mentioned in subdivisions 1, 2 and 3 of the next preceding section; and

"(2)   That the instrument is at the time of his indorsement valid and subsisting.

"And, in addition, he engages that on due presentment, it shall be accepted or paid, or both, as the case may be, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it."

It is obvious, however, the statute is not intended to define any obligation or liability to the drawee, who, as already noticed, by the terms of § 62 of the negotiable instruments law (Rem. Code, § 3453), upon acceptance, and hence upon payment, admits the capacity and authority of the drawer to draw the instrument and the existence of the payee and his then capacity to indorse.   That the rule as to the contract of indorsement, announced in § 66 of the act, does not run in favor of the drawee, but only to some intermediate party, is also established by the unnumbered closing paragraph of the section in enumerating the undertakings or engagements made by the indorser upon which any subsequent indorser may rely when the instrument is presented to the party upon whom it is drawn; and also for the further reason that the statute positively limits its scope "to all subsequent holders in due course."   "Holder" refers to one who has taken the instrument as it passes along in the course of negotiation towards the drawee, and not the latter, who, upon the acceptance and payment of the instrument, thereby strips it of all negotiability and reduces it to a mere voucher or proof of payment.   This rule is clearly stated in the case of *First National Bank v. Bank of Cottage Grove*, 59 Ore. 388, 117 Pac. 293, as follows:

"When the defendant bank, which was a holder in due course, presented these checks to the plaintiff bank, the drawee, and they were honored, accepted, and paid, the prior indorsers were thereby discharged from further liability. The checks when so paid had run their course; they were no longer checks within the meaning of the negotiable instruments law, but only canceled vouchers; and the plaintiff was not a holder thereof in due course. *St. Louis Bank v. German American Bank* (Mo. App.), 127 S. W. 434; *Riverside Bank v. Shenandoah Bank,* 74 Fed. 276, 20 C. C. A. 181; *Neal v. Coburn,* 92 Me. 139, 42 Atl. 348, 69 Am. St. Rep. 495; *Farmers' & Merchants' Bank v. Rutherford Bank,* 115 Tenn. 64, 88 S. W. 939, 112 Am. St. Rep. 817."

Nor is respondent's contention tenable that appellant is foreclosed by the judgment of the United States against it. It is true that, when that suit was brought, respondent promptly advised the appellant thereof and tendered the defense to it. The offer was declined. The appellant was under no legal obligation in the premises, and hence in no way estopped or concluded by the judgment in that case.

Reversed, with directions to enter judgment in favor of the appellant.

ALL CONCUR.